Vito J. Titone, J.
Plaintiff corporation, builder of one-family homes on Staten Island, sues to recover money allegedly retained wrongfully by defendant corporations, who are engaged in the business of mortgage banking, funding, and brokering. The latter companies agreed in the fall of 1965, to arrange mortgage financing and construction loans for plaintiff’s construction of a development consisting of approximately 110 homes. Defendant U.I.&I. Funding Corporation is a successor to defendant United Institutional Servicing Corp. The case was tried without a jury.
The dispute centers on mortgage moneys totaling $122,829.20 withheld by the mortgage companies. $82,535.30 of said sums was held by the defendant companies to guarantee the issuance of certificates of occupancies to the purchasers after the closings, and $40,293.90 (sometimes referred to as warehousing charges) was retained by the same companies, ostensibly to indemnify them for actual or contemplated losses resulting from their assigning mortgages to a savings bank after closings of title at varying discounts. The record indicates that defendants also used part of the $82,535.30, set aside to secure certificates of occupancy, to recoup their losses sustained in the discounting of the mortgages.
The parties concede that defendants paid the plaintiff or its creditors from the $122,829.20, the sum of $66,926.20. It was further stipulated that $5,500 is still held in escrow for three certificates of occupancy not yet obtained by the plaintiff. Thus, the amount in dispute herein is $50,403.
The thrust of plaintiff’s case is that beginning in 1966, and continuing to March, 1968, the defendants continually demanded that "discount” moneys be withheld from mortgage proceeds at time of closings. Plaintiff complains that the threats by defendants not to close unless its losses from discounts required by the assignee banks were assumed by plaintiff, and paid from such discount money, constituted economic duress, and was an improper extraction of plaintiff’s funds. The plaintiff further asserts that the initial agreement between it and defendants in the fall of 1965, did not include the withholding of such moneys for any of defendants, subsequent losses resulting from assignments of the mortgages.
In rebuttal, defendants claim (1) that they as mortgage *21 companies arrange financing for building loans for new construction and building mortgages; (2) that they in effect presell the mortgages in their portfolio; (3) that their fee for placing the building mortgage, and closing it, and assigning it to a bank, was 1% of the mortgage, or $200 to $250 for each house; and (4) the original agreement with the plaintiff was that the plaintiff would indemnify them for whatever discount terms the assignee banks required.
The uncontroverted evidence adduced at the trial, reveals that sometime in 1965, the plaintiff corporate officers (McErlean and Lentini) discussed the financing of their proposed Staten Island Development of 110 homes with their counterpart officers of the defendants’ firms (Katz and Levine). It also seems undisputed that the parties agreed at the time that the mortgage company then involved would package the financing for the 110 one-family homes to be constructed by the plaintiff, and that such company would receive a $200 service charge plus a $6 credit charge for each deal. It was further orally agreed that in the event that a certificate of occupancy had not been issued at the time of closing, that a portion of the mortgage moneys would be held in escrow by the mortgage company to ensure the eventual obtaining of such instrument by the.plaintiff.
The testimony of the plaintiffs officers also suggests that they were aware from the outset that the defendant mortgage company with whom the plaintiff was doing business at the time, acted as a conduit between it, as the builder of the homes, and a savings bank, and that the mortgages, although closed in the mortgage company’s name, would eventually be assigned by such company to a savings bank. In the case of plaintiffs new homes, the assignee bank would be either Staten Island Savings Bank or the Williamsburgh Savings Bank. In essence, the dispute centers on whether, as plaintiff claims, mortgage moneys were wrongfully extracted from plaintiff at the closing to cover any losses when the mortgages were subsequently discounted, or whether the parties agreed at the outset in 1965, that the plaintiff would indemnify the mortgage company for such losses.
The crux of testimony adduced from defendants’ witnesses (Katz and Levine) on this question, was that the Staten Island Bank agreed to the assignment of mortgages on plaintiffs homes without a certificate of occupancy being in existence at closing provided such instrument was issued within 30 to 60 *22 days thereafter. However, Williamsburgh Savings Bank refused to accept an assignment unless a certificate of occupancy was in existence. According to Levine, at the time his company issued a mortgage commitment in its own name, it had already obtained one from the savings bank to whom it was selling the mortgage. Katz and Levine both testified that plaintiff’s officers, McErlean and Lentini, agreed in 1965 that moneys would be deducted at the closings because possible fluctuation in the interest rate might affect the size of the discount demanded by the assignee savings bank.
Plaintiff’s witnesses, McErlean and Lentini, both testified in essence that in the summer of 1966, after plaintiff had constructed a number of its homes, the mortgage company representative, at the closings on a number of the homes, refused to close on the mortgages financing them unless a portion of the mortgage moneys were withheld by the mortgage company to cover whatever loss it might sustain in assigning the mortgage to one of the savings banks. According to both witnesses, not to acquiesce to such demands of the mortgage company at that time, would have forced plaintiff into bankruptcy since it was heavily indebted to its suppliers and subcontractors for many of its homes, either completed, or in various stages of construction. Plaintiff’s lawyer, Hugo S. Puglia, testified that during such period, he did not receive advance notice before a closing that such a discount would be demanded, but was first faced with such demand at time of closing. Both McErlean and Lentini denied that at the outset, in the fall of 1965, they promised to obtain certificates of occupancy within a specified time, or indemnify the mortgage company for discount losses, since they were then cognizant that it was very difficult to obtain such an instrument in Richmond County.
The court is constrained to find as a matter of fact, that the parties did not initially agree in 1965 that moneys would be withheld from mortgage proceeds to cover defendants’ discount losses; and that the demand by defendants for such withholdings first occurred in 1966, after many of plaintiff’s homes were either ready for occupancy and set down for closings, or were in various stages of construction. Such pressure tactics, in the court’s opinion, constituted economic duress and an improper extraction of plaintiff’s funds.
The record reveals that the mortgage applications submitted by the purchasers, although given to them by the plaintiff’s representative, were issued under the letterhead of defendant *23 U.I.&I. Funding Corp. No statement is included in any of them that it would be submitted to a savings bank for approval. Furthermore, it is uncontroverted that the purchasers received commitment letters directly from the mortgage company. No indication or suggestion was contained in any of them that the mortgage company would eventually sell the instrument to a banking institution, or that the commitment was conditioned upon the ability of the mortgage company involved to effectuate such a sale. For all intents and purposes, the mortgage company was the prime mortgagee.
In support of the court’s determination that no agreement was made initially in 1965, to the effect that the plaintiff would indemnify the mortgage company for losses in discounting the mortgage, is the fact that nothing in the record suggests that the mortgage market at that time was in a state of flux, constantly and drastically changing.
However, the evidence strongly suggests that the mortgage crisis began sometime in the summer of 1966, many months after the initial arrangements were made by the parties. At that time, the plaintiff was economically vulnerable, having heavily obligated itself to suppliers and subcontractors, while the mortgage company then involved, finding itself saddled with a portfolio of speculative mortgages, which could only be unloaded at a loss, decided to recoup any losses from the economically straitened plaintiff.
The evidence upon which the court partially bases such conclusion is contained in a series of letters sent plaintiff’s attorneys by the mortgage company from the fall of 1965 to the fall of 1967. The letters sent from September, 1965 to May, 1966, simply recite that a loan had been approved for 30 years at a specified interest rate, either 516. or 6%. However, the letters sent from August, 1966 to October, 1967, contain, in some instances, additional provisions, inter alia, that the commitment was subject to the terms and conditions set forth in the commitment between the parties, or that there was a 1% discount in addition to the mortgage company’s regular fee. Furthermore, unlike in the earlier letters, outside closing dates are set forth in some of the later ones.
Such changes in the tenor of the later letters strongly indicates that the discount question first arose in 1966, months after the parties had entered into their original agreement.
Although there are factual differences, the court believes *24 that a case strongly in support of plaintiff’s position is Leben v Nassau Sav. & Loan Assn. (40 AD2d 830, affd 34 NY2d 671). In Leben, the mortgagors, purchasers of a one-family home, received a commitment for a mortgage loan at 6% interest from the defendant bank. However, at the closing, they were informed for the first time that the mortgage would bear interest at the rate of 714%. By that time they had already expended more than $8,000 in connection with the purchase and had canceled the lease on their apartment. Over objection, they signed an assumption release and modification providing for interest at a rate of 714%. The Second Department, by a 4 to 1 vote, held that the plaintiffs signed such papers authorizing the increase of interest as a result of economic duress, and accordingly directed that such instruments be reformed to provide for interest payable at the original rate of 6%. The Court of Appeals unanimously affirmed on the memorandum of the Appellate Division.
In the instant case the court finds that the requirement that plaintiff assume the losses sustained by defendants in discounting their mortgages, at a time when it was heavily in debt and obligated to subcontractors and suppliers, constituted economic duress, entitling them to a refund of those moneys still withheld by defendants, less the amounts still withheld pending issuance of three certificates of occupancy.
With respect to defendants’ claim of indemnity, which is in the nature of an affirmative defense, the court is of the opinion that one who alleges the existence of an agreement wherein he will be indemnified for any loss in business dealings with a third party, must establish by a preponderance of the evidence that the purported indemnitor has legally obligated himself to compensate him for such loss (cf. Nantasket, Inc. v Raboy & Co., 31 AD2d 804). In viewing the evidence most favorable to the defendants, the court is constrained to conclude that since the agreement in the fall of 1965 was made without the mortgage company procuring any written endorsement or guarantee, the defendants have failed to establish that the plaintiff bound itself to protect the defendants against loss in any subsequent discounting of the mortgages (cf. Interstate Elec. Co. v Interstate Elec. Co. of Shreveport, 33 So 2d 779, 783-784, [La]). In light of modern business practices, the leaving of such a vital matter as receiving indemnification for losses in the discounting of mortgages, to an informal and oral agreement, is, to say the least, highly *25 unusual (cf Safeway Trails v Allentown & Reading Tr. Co., 185 F2d 918, 920).
Accordingly, plaintiff is awarded $50,403 plus interest from November 20, 1973, the date that the within action was commenced (cf. Temple Beth Sholom of Smithtown v Fitzsimmons & Assoc., 42 AD2d 739; Earnest v Deskey Assoc., 312 F Supp 1312).